The first case call for oral argument is LWL Land Trust v. Werner. Counsel, whenever you're ready, you may proceed. Good afternoon. May it please the Court. My name is Brad Allen, and I represent the defendants in this case, Les and Deborah Werner, the appellants in this argument. The main issue before the Court is whether riparian rights attached to the body of water was at issue in this case. This case was brought, just to go briefly into the procedural history, this case was brought by LWL Land Trust in the form of a declaratory judgment action seeking a declaration that the plaintiff had rights to use the entire body of water at issue in the case. An issue had emerged as to whether our client had the right to put a fence across the portion of the lake that was the boundary between their property and LWL Land Trust property. A bench trial occurred in December of last year, and the Court ultimately concluded that the plaintiff wasn't entitled to use the entire surface of the body of water. The trial court found that the body of water was part of a water course, and also found that the architecture becomes natural rule by meaning that the body of water had acquired the characteristics of a natural body of water, and therefore there were riparian rights attached. Just briefly in terms of the factual history, the Werner family, my client's family, owned the land on which the body of water sits for many, many years. They owned it in its entirety up until 2007, at which point a parcel of that was sold by my client, Mr. Werner's brother, to LWL Land Trust. But going back into the 40s and 50s, the Werner family owned that property. And how this body of water emerged was that during the 1950s, late 50s, early 60s, some strip mining occurred, and at the conclusion of that, the area that had been stripped eventually filled with water, thus forming the body of water that was at issue. There was some testimony that there's water runoff, also rainfall, and also some groundwater that appears to fill this basin with water. Now, as to the legal issues, there's no real dispute that the body of water in question was man-made, it was Roosevelt's strip mine. The real question is whether riparian rights can apply under some circumstance. Now, the general rule applied in these types of situations is that no riparian rights attach to a man-made body of water, at least not automatically. That's the Nottolini case, the second district case from 2003, which stands for that proposition that man-made bodies of water don't have riparian rights, natural bodies of water do. Now, more recently, the Alderson v. Fatman case, which was a Supreme Court case in 2008, also made this point that riparian rights do not attach to a man-made body of water. But the Alderson case did say that there are some circumstances in which a man-made body of water can be treated as a natural body of water for some purposes. And that basically, really the question then is whether or not, and the Alderson court mentioned, if it's part of a water source, if a man-made body of water is part of a water source, it can be considered to be a natural body of water. Or if something called the artificial becomes natural rule applies, then it can also be treated as a natural body of water. As I mentioned, the trial court found that the body of water was part of a water source and that the artificial becomes natural rule applies. Was there some evidence to support the trial court's decision? Was there evidence from which the trial court could conclude as it concluded? Well, there was testimony about the type of runoff that occurred from rainfall on the slope. There was some testimony about the slope of the surrounding farm fields. And there's really no dispute that water does flow into the body of water. You know, there is a slope. I think there was some debate. I think the expert, the plaintiff's expert had it as maybe a 1% slope. And the county soil conservation service had it as a 4.2% slope, something like that. But there was, we don't dispute that there is water that flows into the body of water. Well, my point is this is a bench trial. We're reviewing this on manifest way to the evidence standard, right? Which means we would only reverse if the opposite conclusion was clearly apparent. And aren't we just supposed to examine to determine whether or not there's some evidence to support the trial court's decision in a manifest way standard? And if there is a firm. So tell us why. Well, we believe that the court did not apply those exceptions. That our decision becomes natural rule and this idea that it's a water course. We believe that there is a basis for overturning the court's decision based on the trial court's application of those rules. He did hear expert testimony, though, didn't he? Which would support that this was a natural runoff. Well, he heard expert testimony about the flow runoff from the field towards the body of water. We don't believe that that's the full story with respect to determining whether it's a water course. Well, is it a matter, though, of, well, are you saying there was a complete failure of proof then? Or are you saying that there was contrary opinions from which the trial court chose the other side? Well, there was no contrary to expert opinions on that. But we believe that the definition of water course is a little different than what was applied. So you misapplied the law? Yes. Okay. Do you dispute that this body of water also had some flow into a river system? Well, the testimony was that certainly I think that we would acknowledge that it does flow from, you know, there's water runoff into this body of water. Even before the body of water existed, before the strip mining occurred, that was the direction that the water flowed. You know, and there was acknowledgment that it does flow towards, eventually towards perhaps Richland Creek. You know, so we don't dispute that there is a part of a natural flow of water somewhere along those lines. We just don't believe that the water course was, we just don't think that that was perhaps applied appropriately, given the definition of a water course. We, you know, we don't dispute that there is a restatement section, restatement of the course section, that does define what a water course is. And as I said, we don't dispute that there's water that flows towards that. We just really question whether that's enough to consider it a water course. The definition that was cited by the plaintiffs in this case, from the restatement, is that a water course is a stream of water of natural origin flowing constantly or recurrently on the surface of the earth in a reasonably definite natural channel. It's not clear to us that there's a natural channel. The water comes from, you know, there was testimony that there are a couple of springs somewhere, or seeps up near one of the farm fields. There's testimony by the expert about runoff and so forth. But really this is a farm field that, and I guess we would dispute, we would argue that a farm field, even if that's the way the water does tend to flow, we're not sure if that's a natural channel sufficient to be considered a water course under that definition. Is that a factual determination? I'm sorry? Was it a factual determination that the court made whether it was or was not a water course? Yes, it was a factual determination. Okay, so then we review it on manifest way to the evidence. And there was some evidence in the record to support the trial court's determination, wasn't there? Well, if it was in terms of that there was water runoff into the field, I don't. . . I mean, it's not our job to reweigh the. . . We're not supposed to reweigh the evidence, retry the case on appeal. Right. I agree with that. I don't recall that there was. . . I don't recall that there was testimony specifically about a particular channel that the water flowed on. So. . . Okay. It's a constituted water course. The only channel that I recall was that there is a drainage ditch that was dug by my client's father on the south part of the lake, not the part that runs from where the water runs off, but on the other side of the lake, which would drain off water if water overflows from the lake. But there was no. . . I don't think there was a real definition of a natural channel through that field. And, you know, we just think that as a practical matter, if the field itself is considered a natural channel, that seems a little bit too broad, perhaps, for the definition of a water course. The field, as I recall, has had different types of crops grown on it. So it would seem to me that if there's any water course that would certainly be dug out by tractors and so forth, it would be hard to, I think, consider that a natural channel of some sort. The other basis of the course decision was on the artificial becomes natural rule, which looks at three factors, whether a way or stream is temporary or permanent, the circumstances under which it was created, and the mode in which it has been used and enjoyed. The body of water clearly has been there for a long time since the strip mining occurred. And the circumstances under which it was created was clearly the strip mine. I think their issue when it relates to artificial becomes natural rule is the mode in which it has been used and enjoyed. And there was testimony that our clients and our family had, over the years, to some degree used it for fishing. In fact, Mr. Werner, my client's father, had stocked it once it had filled in, and that there was some swimming and stuff in it. But still, the Alderson case that I mentioned talks about the artificial becomes natural rule being applied in situations where the person invoking the rule has relied on using the artificial body of water without dispute for a lengthy period of time. And in this case, we don't have that here. Mr. Schauer, the principal of LWO Land Trust, who, again, purchased the property from our client's brother, he indicated in his testimony that he had swam it a few times as a teenager, and perhaps fished in it sometimes as a teenager, but I think he mentioned maybe being 11 or 12 years old at the time. But he hadn't been in it or near it until he bought it in 2007. So our view is that there's really a 20, 25 year gap between the time that he had last used it and the time that he had bought it. So we think that the court erred in applying the artificial becomes natural rule in determining that the riparian rights attached. Again, the lake was not, and as the creation of the lake, the lake was not created to benefit the land around it. It was really created as an after effect of a strip mining. And so, again, we do not think that rule would apply. How this all fits into the bigger picture of the law, of course, is there's a Beecham case, which was a 1988 Elmwood Supreme Court case, which tells that basically when you've got people who are owners of property along a lake, they all have the Beecham case held that all the property owners adjacent to the lake essentially have riparian rights and the right to use the entire lake. Again, subsequently, then you have the Nottle-Meany case, and then more recently the Alderson v. Statlin case, which said that you can't, first of all, there is a distinction between natural and man-made bodies of water. So to the extent that this is a man-made body of water, and to the extent, again, that we dispute whether or not this is a water course or the artificial has become natural or applied, we are asking the court to overturn or reverse the trial court's decision. Are there any other questions? I don't believe there are. Thank you. And I will rest on my grievance to the other issue that was raised. Thank you. Thank you. Counsel? May it please the Court? My name is Carson Menges. I represent the plaintiffs in this case, the LWO Trust. The beneficial owner of that trust is Brad Kevin Schauer. As Mr. Allen pointed out, there are two ways in which this body of water can be determined to have riparian rights attached to it. It can either be part of a water course or it can fall within the artificial becomes natural water. With respect to it being part of a water course, I would submit that all of the evidence in the case indicated that it is indeed part of a water course. The testimony indicated that water flows from the northwest corner of the Warner property to the southeast corner of that property where it enters the lake or the body of water. It then flows from that body of water through various creeks and streams ultimately to the Richland Creek, the Kaskassia River, and ultimately the Mississippi River. An expert testified in the case, a licensed civil engineer who is an expert in hydrology and in water resources, Roger Biley. He testified that the water does flow from the Warner property into this body of water and ultimately to the Richland Creek and the Kaskassia River. He also testified that during a two-year storm event, this water flows at a rate of 323 gallons per second. That's a significant amount of water flow. It was testified by Mr. Warner himself, the defendant, that this is the same path that the water flowed in prior to the strip mine being there. In other words, it's still flowing through the same natural drainage that it's always flowed. This was also testified to by Mr. Schaller and by Mr. Biley. And it was uncontradicted. With respect to the Artificial Becomes Natural rule, even if it's not a part of the Water Course, it still falls within the Artificial Becomes Natural rule and therefore has repairing rights attached to it. There's three factors with respect to the Artificial Becomes Natural rule. Whether the body of water is permanent or temporary is the first one. This body of water has been in the same condition for approximately 50 years. There is no testimony or evidence whatsoever to indicate that it's anything but permanent. In fact, Roger Biley testified that the reason that the lake stays permanent and that the lake is there is because of the fact that it's part of the Water Course. The water that flows into the body of water from the Werner property flows at a rate greater than evaporation and therefore the body of water stays. If it weren't for being part of the Water Course, the body of water would actually evaporate, according to the expert testimony. This lake was created in the 1960s when Alfred Werner, the father of Leslie Werner, contracted with a mining company which dug the mine, which was eventually turned back over to Werner's for use as a lake. And that's the second factor which is looked at, the circumstances under which it was created and whether those are consistent with the body of water being permanent. In this case, that is totally consistent with the body of water being permanent. He allowed the strip mining company to come in there and mine it so that you could have a lake, and this lake is permanent on the piece of property. And the third factor which Mr. Allen also brought up is how the body of water is used. And he mentioned that it has to do with whether it's used recreationally, and that is true. During the trial, it was established that Mr. Werner himself used the lake for boating. Another adjacent property owner, the Knask family, who also owns property which abuts the lake, also uses the lake for boating and fishing without objection from the Werners. The lake was stocked with fish. It's fished. Mr. Schaller has swam in the lake for at least 35 years. Mr. Werner has fished in the lake. Mr. Werner's father and his retired friends also fish in the lake. The Knasks have a speedboat which they use recreationally on the lake. And the Werners also have a jon boat which is used on the lake. The issue that the court looks at with respect to this, and this is from the Alderson Supreme Court case, where the way is of a permanent character and is created under circumstances indicating an intention that it shall become permanent and it has been used consistently with such intention for a considerable period, it is generally regarded as stamped with the character of a natural water source. In this case, all those factors are met. This recreation is consistent with the intention of it being permanent, and there is no question that this body of water is permanent. Mr. Allen brought up the Nottolini and the Alderson cases. Those cases analyzed the water course in order to determine whether it fell from the artificial, or excuse me, they examined a rock quarry which was later built with water and determined whether or not it fell from the artificial and becomes natural rule. First, I'd like to distinguish those cases in that they never looked at whether or not these rock quarries were part of the water course. There was no evidence in those cases to have anything to do with part of the water course. In fact, in the Nottolini case, the rock quarry normally would not lie at all on the plaintiff's piece of property. Only during times of flood would it expand and end up on the plaintiff's property. In that case, they held that it wasn't part of, or it did not fall into the artificial becomes natural rule, but they didn't analyze the water course issue, and this goes back to Roger Biley's testimony. Roger Biley testified that, he's the civil engineer expert, that during storms and periods of more rain, there's additional input and additional output to the body of water in our case. In the Nottolini case, in the Alderson case, there's not additional input and output. Those are not part of the water course. What happens with those during the time of rain is it expands. As in Nottolini, that's the only time that the water even ends up on the plaintiff's property. During a time of drought, the water contracts. And that is how those cases are distinguished. They're also distinguishable because in those cases, there was no recreational use of the bodies of water as there is here. Thirdly, they're distinguishable because the concern of the court in both Nottolini and in Alderson, and the underlying reason for their decision in those cases, was that it would be inequitable for one party to benefit from the fruits of the labor meant to benefit another piece of property. In this case, that is not a concern. Alfred Werner purchased the entire piece of property, which contained the entire lake. The lake was later subdivided by Mr. Werner. The property was later subdivided by Alfred Werner, the father of the defendant. He could have subdivided that in any way he liked. He subdivided it with half of the land, or excuse me, a portion of the land having the body of the lake on it, and also the other portion having the body of the water on it. So there's no concern that the fruits of one person's labor for one piece of property is now extending to benefit another. This body of water was, from its inception, intended to benefit both pieces of property. The land was divided so that the body of water was on both. Something that was brought up in the defendant's brief, it was not addressed orally, but I would like to address it, is that Mr. Werner wanted to put this fence across the body of water in order to prevent his cattle from trespassing onto my client's land. And to that argument, I would say that Mr. Werner cannot be entitled to commit one tort in order to prevent himself from committing another. He cannot keep my client from being able to enjoy his riparian rights simply so that he can avoid himself trespassing onto his land. If he wants to keep his cattle off the property, he can build a fence which doesn't cover the lake. He can build a corral. He can do a number of things, but he cannot keep my client from his riparian rights. I would also submit that he possibly should not be allowed to allow his cattle into the water as it could command the entire lake, including a portion of the lake that's on my client's land. When the Illinois Supreme Court initially adopted the civil rule, which is a rule that allows anyone who owns a portion of a lake bed to use and enjoyment of the entire lake surface, the reason that they came to that conclusion is they specifically noted that one of the impractical consequences of following another rule would be the erection of fences across bodies of water. That's exactly what we're talking about in this case, and that's exactly what the Supreme Court was trying to avoid, is the erection of fences across bodies of water. They specifically said that restricting the use of a lake to the water overlying the owner's lake bed property can only frustrate the cooperative and mutually beneficial use of that important resource. I think there's no question that this lake is part of a watercourse. Mr. Allen stated that he thought there wasn't a reasonably definite channel. I would point your attention to Exhibit D-19, which is attached to my brief. It's a picture of the channel. I think you can see that it's clearly a reasonably definite channel. It's on page SA-3. I think there's no question it's part of a watercourse. Everyone who testified to the case testified consistently that it being part of a watercourse. What I don't understand, Counsel, is you said there's how many thousand gallons a second? 323 gallons per second. Well, that doesn't look like 323 gallons a second. It looks like about a bucket every couple of minutes. Sure. Is that a picture of what goes into the lake? No, that's actually a picture coming out. That doesn't look like very much. It doesn't have to be. The 323 gallons is with respect to a second. 323 gallons per second. I don't know when that 323, when's that supposed to be, in a flood? During a two-year storm event. The worst storming every two years. Correct. During an average two-year period. However, the definition of watercourse in the definition of the restatement specifically states, many streams have a constant flow. Others may flow only periodically or occasionally and do not exist in time of drought. In other words, it doesn't have to be 323 gallons per second constantly. It just needs to have a reasonably definite channel. In fact, it can be dry at periods of time during a drought. So that testimony really didn't mean anything. Well, what that indicates is that it's unlike a quarry, which expands and contracts during times of storm and times of flood, that in this case it's increased input and increased output during time of flood. Different from a quarry. I think that all the testimony in the case indicates that it's part of a watercourse. If you believe that that was against the manifest way of the evidence, then you can turn to the artificial becomes natural rule. I think that under that, there's also no question that this body of water falls into that. It's permanent. It's created with the intention to become permanent, and it's used recreationally and has been for at least 35 years. With respect to the other issue in this case, briefly, when Mr. Werner began erecting this fence along the property line, he cut down on a bunch of trees on both his property and on my client's property. There were two conflicting pieces of evidence as to the value of those trees at trial. The defendants presented an expert who justified as to the value, and we also presented an estimate from Hudson Tree Services estimating the value. The trial court heard both pieces of evidence. The expert that was presented by the defendants did not consider the value of the trees that were cut down on my client's property. He only considered the value of the trees that were cut down on Mr. Werner's property. Now, what I understand is these are elm trees, aren't they? There's some elm and some spruce. Now, is there any kind of elm used for any kind of wood? Do they have any value at all? I'm not sure of that. I mean, there was no testimony. There was no testimony. As to how much board feet you'd get out of each tree or something like that? Correct, there was no testimony. What I don't understand is Hudson Tree Services, I thought they just trim trees. They don't harvest trees.  Not for the value of the trees? Correct. The value of the trees was determined by the trial court to be $500. It was the value of the removing which was determined to be $4,500. And that was what Hudson Tree Services did. In other words, the salvageable wood for whatever purpose was $500 is what they said? Correct, correct. Now, but was that divided between where that fence was on each side or was it? That's what I don't understand. Mr. Calvert, the expert for the defendant, testified with respect only to the value of the trees cut down on Mr. Werner's property. Okay. The Hudson Tree Services took into account the value. But they were doing $4,000 for something else. $4,500 for removing. Cut down and remove is, of course, the value of what a tree is worth. That is correct. The trial court heard both conflicting pieces of testimony and determined that Mr. Calvert's testimony was less than believable and was less than complete. And having been able to see both, determined that the value presented by the Hudson Tree Services cleanup was more truthful and therefore found $4,500 as the cost of removing and then $500 as the value of the trees. The court took judicial notice of the Revolving Tree Cutting Act, which provides for trouble damages for the value of the trees and therefore determined $1,500 damages for the value of the trees for a total of $6,000. Unless there's any questions, that's all I have. I don't believe we do. Thank you, counsel. Thank you. Counsel? If I could just briefly, and we're both, I think that would just emphasize that that picture I think that was referred to, as you indicated, was the picture of the drainage ditch. And so in terms of the determination of whether it's a watercourse or not, we don't think that the waterfall, again, in the field would be considered a watercourse. As to the storm event and so forth, we think that that's a pretty rare event that happens that you're going to see that much flow. Again, we would argue not a watercourse. Otherwise, as to the testimony that occurred, obviously that's in the record. I won't belabor that point. But we do dispute some of the statements about the extent of use that were put forth by Mr. Mangus in his argument. Could you discuss the value of the trees? I'm having a little trouble with that. Well, our expert came out and took a look and was hired by Mr. Murr. He came out and he looked at the area where the fence had been pulled up, had been cut, the area that Mr. Werner had cut to extend the fence. The testimony of Mr. Calvert was that there were, I think, five elms or one elm and five ridges, something like that. And those were the only trees that he saw. And the testimony, there was questioning about to what extent our expert looked at the other side of the line and so forth. But we believe that the trees shown along the boundary line were the ones that were at issue. And I don't recall now drawing a blank here about the exact figure that he came to, but it was obviously much less than what the plaintiff's expert was. I don't have anything further to say. Thank you. We appreciate the briefs and arguments of counsel. We take the case under advisory.